**OZARK SKYWAYS, INC.,**
**Plaintiff-Respondent,**

**v.**

**BOMARK STEEL STRUCTURES, INC.,**
**Defendant-Appellant.**

**No. 12279.**

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 31, 1983.

Motion for Rehearing or to Transfer
Denied Feb. 22, 1983.

Application to Transfer Denied
March 29, 1983.

William R. McDonald, John E. Price, Woolsey, Fisher, Whiteaker, McDonald & Ansley, Springfield, for defendant-appellant.

No appearance for plaintiff-respondent.

FLANIGAN, Presiding Judge.

This litigation arises out of the faulty construction of an airplane hangar at the Springfield Municipal Airport. In May 1977, plaintiff Ozark Skyways, Inc., (Skyways), entered into a written agreement with defendant Bomark Steel Structures, Inc., (Bomark), whereby Bomark was to construct the hangar, for a price of $27,635, on land leased by the city of Springfield to Skyways.

The plans and specifications for the hangar required a subsurface depth of 30 inches for the foundation beneath the rolling doors which were located on the north and south sides of the building. In violation of that requirement, Bomark constructed the foundation in accordance with a modified plan (set forth in Skyways' Exhibit 3–a—"the 3–a plans"), and the actual foundation had a depth of approximately eight inches.

In April 1978, after the hangar had been constructed, Skyways and Bomark entered into another written agreement. That document recited that disputes had arisen between the parties concerning "the quality of said construction work including, but not limited to, satisfactory operation of all the hangar doors." The agreement recited that one-half of the contract price had previously been paid and that of the remaining half ($13,817.50) $9,817.50 would be paid to Bomark upon the latter's furnishing Skyways lien waivers and an affidavit. That payment was made. The balance, $4,000, was to be held by Skyways for a period of one year and "if, after April 24, 1979, all of the hangar doors have worked and are still in satisfactory working order," the $4,000 was to be paid. The agreement further provided that if one or more of the hangar doors did not work properly, Bomark agreed "to repair or replace, at Bomark's expense, any deficiency and make any necessary changes upon being notified by Skyways as promptly and as soon as possible."

Skyways experienced difficulty with the north doors and the south doors. The major problems with the doors were encountered in the winter months beginning in the winter of 1977–78 and continuing through 1979–80. The defects required that the north doors be left closed and the south doors be left open. In October 1979 Skyways brought this action against Bomark, seeking $15,000. The petition alleged that Bomark had breached the May 1977 agreement and had erected the building "in an unskillful and negligent manner so that shortly after its completion the foundation settled, hangar doors failed to work, and the building was and is untenantable and nearly useless."

Bomark's answer admitted the signing of the May 1977 agreement and generally denied the other allegations of the petition. The answer also pleaded, as one of nine "affirmative defenses," that plaintiff "has failed to join an indispensable party." As a counterclaim Bomark pleaded that Skyways still owed $4,000 on the contract price for which, together with interest, Bomark prayed judgment.

Thereafter, on motion of Skyways, the city of Springfield was added as a party defendant. The city filed an answer directed to the petition although the petition made no claim against the city and requested no relief from it. Neither the city nor Bomark requested relief from each other and no cross-claim was filed.

Sitting without a jury, the trial court found in favor of Skyways and against Bomark on the petition and awarded Skyways $9,688 subject to a $4,000 credit in favor of Bomark, which was the balance due on the contract price. Thus the judgment, in effect, awarded Bomark relief on its counterclaim. The judgment further recited that the city of Springfield "is to be dismissed

and discharged without cost, having requested no other relief." Bomark appeals.[1]

Bomark's first point attacks the following finding of fact made by the trial court: "that frost heaving has definitely occurred in the building in question and (unless corrected) will in the future occur which will result in further damage to the building." Bomark claims that the foregoing finding is not supported by the evidence. In support of its first point Bomark argues that there are inconsistencies in the testimonies of two experts who testified for Skyways. The experts were Saul Nuccitelli and Windsor Warren.

"Where, as here, the testimony of a witness, even though not altogether consistent, is not inherently contradictory, it must be considered as an integrated whole." *Odum v. Cejas,* 510 S.W.2d 218, 225 (Mo.App.1974). When the evidence is scrutinized in light of that principle, Bomark's first point fails.

Witness Nuccitelli, whose expert qualifications were conceded by Bomark, testified that when moisture in soil changes from a liquid to a solid state, it expands and causes "frost heave." To protect building foundations against the effects of frost heave, the generally acceptable foundation depth in Southwest Missouri is at least 30 inches. According to Nuccitelli, the foundation constructed by Bomark pursuant to the 3–a plans "would be and definitely could be subjected to frost heave." Such foundation was "not sufficient to prevent frost heaving," "not good enough to meet necessary requirements on frost heaving." Nuccitelli also testified that "I know that frost heaving has occurred," and that the 3–a plans were "an unacceptable design." The problems resulting from frost heaving became "progressive." There is a "continuous aggravation" of the problem which will cause "continuous deterioration of the building."

Expert Warren testified that the 3–a plans were not "structurally sound" and that "frost heaving will occur with regard to the entire structure." Warren said that the *amount* of frost heaving would depend upon certain variables presented to him hypothetically by Bomark counsel on cross-examination. Warren testified that the difficulties with the use of the doors, which had been experienced by Skyways employees, were one indication of frost heaving, "objective physical evidence of frost heaving."

Bomark itself introduced the deposition of witness Ted Burris, in which Burris testified, under interrogation by Bomark counsel, that he had observed "that our floors are badly cracked" and "there are cracks in the grade beam," and that those are "objective signs of frost heaving."

Bomark's first point has no merit.

Bomark's second point attacks the following finding of fact made by the trial court: "that the change in the plans made by Bomark has resulted in a structurally inadequate building." Bomark argues that "the evidence failed to establish any damage to Skyways as a result of any inadequacies in that no deterioration of the foundation had occurred and any defect in the operation of the doors had been corrected."

Although there was evidence that some repair work done by Bomark upon the south doors had improved their operation, Nuccitelli testified that in spite of those repairs, there was a "very great problem of frost heaving in this building." It was his testimony that the problems would increase in the future and that there would be a "continuous deterioration" of the building. Witness Warren testified that the foundation, if constructed according to the 3–a plans, was not "structurally sound," and that "you are going to have frost heave and eventual cracking of the foundation and of the door tracks regardless of how many times you shorten the doors and fix the doors." Bomark's second point has no merit.

Bomark's third point is that the trial court erred in failing to determine what portion of Skyways' damages should be apportioned to the city of Springfield "because the building is owned by the city and leased to Skyways [and] any damage to the

1. Skyways, as respondent, has not favored this court with a brief.

building constitutes damage to the reversionary interest of the city and Bomark may be subjected to multiple and inconsistent liability thereby."

As previously noted, Bomark's answer alleged, as an affirmative defense, that the plaintiff "has failed to join an indispensable party." The unjoined party was not named. The fact is, however, that the city, on motion of Skyways, was made a party defendant. Although the city pleaded to the petition, the city sought no relief against Bomark by cross-claim nor did the city seek any affirmative relief, including participation in any recovery Skyways might obtain from Bomark.

The lease between the city and Skyways was for a term of 20 years beginning July 1, 1977. The lease recited that Skyways desired to construct the hangar. The lease also provided that at its termination the city was entitled to have the land returned to it "clear of all improvements above ground level which have been constructed by [Skyways] .... [The city] may, at its option, take title to said improvements in lieu of removal by or for [Skyways]."

The city displayed disinterest in the litigation. It did not appear at depositions. On the morning of the trial the court announced that the city "appeared by its attorney earlier this morning and stated that they waived their presence at the trial of the cause." In this court the city filed a document stating "that it does not wish to participate in the appeal of the judgment rendered in the above entitled cause as the conflict between [Skyways] and [Bomark] will not affect this defendant."

The "affirmative defense" regarding the nonjoinder of the unnamed "indispensable party" was incorporated in the answer with eight other "affirmative defenses," all of the latter being clearly without merit. This appears to be an attempt on behalf of defense counsel to hide what might be a live snake in a nest of dead vipers. This court is not concerned with the necessity or propriety of the joinder of the city as a defendant. The fact is that the city was joined. On this appeal Bomark now complains of the failure of the trial court to do something which Bomark at no time requested, by pleading or otherwise. The ninth snake is as dead as its brethren.

Under Rule 52.07, V.A.M.R., persons having claims against the plaintiff "may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability." The rule further provides, "A defendant exposed to similar liability may obtain such interpleader by way of cross-claim or counterclaim." If Bomark felt itself exposed to a claim by the city, which was not a party to the two written agreements, Bomark should have availed itself of Rule 52.07 and sought interpleader. See *Roosevelt Fed. Sav. & Loan v. First Nat. Bank,* 614 S.W.2d 289, 291[1] (Mo.App. 1981). Bomark's third point has no merit.

■ Bomark's fourth point is that the trial court erred in awarding $9,688 in damages to Skyways because: (a) "The award constitutes economic waste and fails to mitigate Skyways' damages because the evidence established that the only objective complaint as to the condition of the building was the binding of the doors, which was partially corrected prior to trial and totally correctable for the sum of $2,000," and (b) The amount was based upon the cost of repair of the foundation and there was no substantial evidence as to the difference in the fair market value of the building before and after "the occurrence, so that the court did not have sufficient evidence before it to determine that Skyways' damages should be based on the cost of repair."

A sufficient answer to Bomark's fourth point is that it is not factually supported by the record. The trial court's figure of $9,688 was apparently based upon the testimony of Cecil Hughes, a general contractor, who testified that reconstructing the foundation so as to meet the requirement of the original plans and specifications would cost $9,688. The record supports the inference that no lesser corrective measures would suffice to prevent progressive damage of the entire building. Although there was some testimony that $2,000 could be devot-

ed to repair of the doors, witness Nuccitelli testified that the $2,000 figure "with regard to the door adjustment is over and above the figure that I testified to yesterday with regard to repairs of the building in accordance with structurally sound plans and specifications.... My testimony yesterday was in the $10,000 to $20,000 range and my testimony today is that if you are going to adjust the doors a little bit that will be another $2,000."

Other testimony of Nuccitelli, although lacking something in clarity, entitled the trial court to find that the hangar as it was in fact constructed had a value of one-half of the contract price and that, properly constructed, it would have had a value equivalent to the contract price. Bomark's fourth point has no merit.

The judgment is affirmed.

GREENE, C.J., and TITUS and CROW, JJ., concur.